IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  11-cv-00578-REB-KLM

SCOTT MASON,

      Plaintiff,

v.

MR. HUGHES, Commander FCF S.E.R.T., and
C/O FRANCIS, FCF S.E.R.T.,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Plaintiff's **Motion for Summary Judgment** [Docket No. 74; Filed March 21, 2012] ("Plaintiff's Motion") and on Defendants' **Motion for Summary Judgment** [Docket No. 90; Filed April 13, 2012] ("Defendants' Motion") (collectively "the Motions").  On April 13, 2012, Defendants filed a Response [#91] in opposition to Plaintiff's Motion, and on June 19, 2012, Plaintiff filed a Reply [#99].  On May 3, 2012, Plaintiff filed a Response [#94] in opposition to Defendants' Motion, and on May 16, 2012, Defendants filed a Reply [#96].  The Motions have been referred to this Court for a recommendation regarding disposition.  The Court has reviewed the Motions, the Responses, the Replies, the entire case file, and the applicable law and is sufficiently advised in the premises. For the reasons set forth below, the Court respectfully **RECOMMENDS** that Plaintiff's Motion [#74] be **DENIED** and that Defendants' Motion [#90] be **GRANTED**.

-1-

## I. Summary of the Case

Plaintiff, who is proceeding *pro se*, is presently an inmate at the Arkansas Valley Correctional Facility ("AVCF"), but during the events underlying this matter he was an inmate at the Fremont Correctional Facility ("FCF").  *See Compl.* [#1] at 1.  Defendant Chad Francis ("Francis") is a Correctional Officer with the Central Transit Unit for the Colorado Department of Corrections but was previously employed at FCF.  *Aff. of Francis* [#90-2] at 1-2.  Defendant David Hughes ("Hughes") is presently a Correctional Officer at FCF.  *Aff. of Hughes* [#90-1] at 1.  Defendants were both members of the Emergency Response Team ("ERT") at FCF, of which Defendant Hughes was in command.  *Aff. of Hughes* [#90-1] at 2; *Aff. of Francis* [#90-2] at 1-2.

Plaintiff alleges that his Eighth Amendment rights were violated during a routine room search on July 23, 2009.  *Compl.* at 4.  He alleges that he and other offenders from Living Unit 6 were forced to stand outside in direct sunlight for a period exceeding seven hours.  *Id.*  Plaintiff asserts that he had "multiple serious conditions" and had been prescribed "multiple medications" that allegedly made him "photo-sensitive."[1]  These conditions allegedly included hyperthyroidism, Graves' Disease, and atrial fibrillation.  *Id.*  Plaintiff had also had two previous heart attacks.  *Id.*  He avers that the ninety-degree heat and intense sunlight caused serious damage to his health.  *Id.*  Plaintiff states that he was

---

[1] Dr. Timothy Creany asserts that the medications Plaintiff was taking do not cause any degree of "photo-sensitivity."  *See Aff. of Creany* [#90-3] at 3.

told that amputation may be required on one or both of his legs.[2]  *Id.*  He asserts that Defendants knew of his medical afflictions prior to the room sweep.[3]  *Id.*

According to the evidence presented by the parties in connection with the Motions, prisoners in Living Unit 6 were escorted to the yard at 9:00 a.m. on July 23, 2009.  *Aff. of Hughes* [#90-1] at 2; *Aff. of Francis* [#90-2] at 2.  Defendants claim that they did not personally plan the room search and did not decide where or how to hold the offenders while it occurred.  *Aff. of Hughes* [#90-1] at 1; *Aff. of Francis* [#90-2] at 2.  Defendant Hughes told the offenders that if anyone was in need of medical attention during the search they should notify the staff.  *See Aff. of Hughes* [#90-1] at 2-3; *see also Aff. of Francis* [#90-2] at 2.  However, Plaintiff asserts that Defendants did not ask him if he needed medical assistance.  *See Aff. of Mason* [#95] at 2.

While prison guards were searching inmates' cells, inmates sat outdoors in the prison yard.  *See Aff. of Hughes* [#90-1] at 2; *see also Aff. of Francis* [#90-2] at 2.  Inmates were escorted to the yard at 9:00a.m.  *See Aff. of Hughes* [#90-1] at 2; *see also Aff. of Francis* [#90-2] at 2.  During the search, Defendant Hughes announced that anyone needing medical assistance would be escorted to medical care upon request.  *See Aff. of Hughes* [#90-1] at 2-3; *see also Aff. of Francis* [#90-2] at 2.  At 11:30 a.m. guards, including Defendant Francis, began escorting inmates to medical care and other ERT members began escorting inmates to water fountains.  *See Aff. of Hughes* [#90-1] at 3-4; *see also*

---

[2]  Although he does not state in the Complaint who told him this, Plaintiff states in his Declaration that Dr. David Oba of the Bent County Correctional Facility told him this.  *Decl. of Mason* [#80] at 2.

[3]  Defendants assert that they had no knowledge of Plaintiff's medical conditions.  *See Aff. of Hughes* [#90-1] at 6; *see also Aff. of Francis* [#90-2] at 6.

*Aff. of Francis* [#90-2] at 3-4.   A hose was also connected to the fence to serve as a "mister."   *See Aff. of Hughes* [#90-1] at 4; *see also Aff. of Francis* [#90-2] at 4.

At approximately 12:15 p.m., the "upper" Living Unit 6 inmates were escorted inside to have an extended lunch.   *See Aff. of Hughes* [#90-1] at 4-5.  The "lower" Living Unit 6 inmates were also given an extended lunch which began at approximately 1:37 p.m.[4]  *Id.* During this time, inmates were provided with another opportunity to seek medical attention. *Id.* At approximately 3:05 p.m., Defendant Hughes sent sixteen ERT members to aid in the search of Living Unit 6.  *Id.*  The search was cleared at approximately 3:30 p.m. and the inmates were brought inside.  *Id.*

Plaintiff asserts that he requested medical attention multiple times, noting that his "legs felt as if they were on fire," but that he was never escorted to medical services.[5]  *See Decl. of Mason* [#76] at 3.  Instead, Defendant Hughes told Plaintiff to inform someone if Plaintiff was "going to fall out."  *Id.*  Although Defendants were aware that prolonged exposure to the weather conditions could potentially create health risks for some of the inmates, they did not believe that the weather necessarily exposed all inmates to a serious health risk.  *Aff. of Hughes* [#90-1] at 6; *Aff. of Francis* [#90-2] at 6.  Due to this knowledge of potential harm, inmates were encouraged to drink water, encouraged to move around the yard (except during the midday count), and provided with an extended meal time inside

---

[4] The record does not appear to reflect whether Plaintiff was an "upper" or a "lower" Living Unit 6 inmate and thus at which time he was led out of the yard and provided with lunch.

[5] Defendant Hughes does not recall receiving any request from Plaintiff for medical care. *Aff. of Hughes* [#90-1] at 5.  Additionally, Defendants do not recall denying any inmate's request for medical care.  *Aff. of Hughes* [#90-1] at 6; *Aff. of Francis* [#90-2] at 4.  On multiple occasions, Defendant Hughes announced that an inmate requiring medical care would be escorted immediately to medical services.  *Aff. of Hughes* [#90-1] at 2-3; *Aff. of Francis* [#90-2] at 3.

the facility.  *Aff. of Hughes* [#90-1] at 4-5; *Aff. of Francis* [#90-2] at 4-6.  Defendants believed that these procedures were sufficient to prevent any harm the inmates might experience as a result of the weather.  *Aff. of Hughes* [#90-1] at 4-5; *Aff. of Francis* [#90-2] at 4-6.  Defendant Hughes remained outside with the inmates throughout the search on July 23, 2009, and was therefore exposed to the same weather conditions as the inmates. *Aff. of Hughes* [#90-1] at 7.

Plaintiff was under the care of Dr. Timothy Creany ("Creany") both prior to and after the search of July 23, 2009.[6]  *Aff. of Creany* [#90-3] at 2.  Dr. Creany had been Plaintiff's treating physician for approximately two years before the search.  *Id.*  He had treated Plaintiff for congestive heart failure and coronary artery disease.  *Id.*  At the time of the search, Plaintiff was taking Coumadin, Amitripyline, Lisinopril, Metoprolol, Nitrostat, Plavix, Simvastatin, Tambocor, and Tapazole.  *Id.*  Several of these medications carry a small risk of causing a rash.  *Id.*  However, Dr. Creany avers that none of the medications that Plaintiff was taking made him more likely to suffer a sunburn, and none would worsen any sunburn that Plaintiff received.  *Id.* at 3.  The potential rash side effect of Plaintiff's medications is independent from sun exposure.  *Id.*  The medications taken by Plaintiff also would not have made him unusually sensitive to hot or cold temperatures.  *Id.*  Similarly, Plaintiff's health conditions did not make him photosensitive.  *Id.*

According to Plaintiff's medical records, Dr. Creany saw Plaintiff on July 24, 2009, the day after the search.  *Id.* at 4.  Dr. Creany noted that Plaintiff appeared well and in his usual state of health except for a rash on his legs.  *Id.*  Plaintiff did not report any symptoms

---

[6] Dr. Creany was not involved in the room sweep and is not a party to this case.  *Aff. of Creany* [#90-3] at 2.

of dehydration or health problems relating to heat exposure.  *Id.*  The only problem Plaintiff reported in connection with the search on July 23, 2009 was the condition of the skin on his legs.  *Id.*  Dr. Creany noted that Plaintiff's legs had a confluent purpura (a "bruise-like" appearance) above the ankle line.  *Id.*  Plaintiff and Dr. Creany reported no rashes on other parts of Plaintiff's body.   *Id.*   Plaintiff had longstanding incidents of edema and hyperpigmentation on his legs and had been treated for these conditions prior to the search on July 23, 2009, as recently as April of 2009.  *Id.*

Dr. Creany was concerned that Plaintiff's skin condition was a side-effect of the Coumadin medication and recommended that Plaintiff stop taking it.  *Id.*  Although sunburn was a possible cause of the skin condition, it did not seem likely to Dr. Creany because the skin condition appeared only on Plaintiff's legs, which had been covered by his pants.  *Id.* Dr. Creany ordered treatment with Silvadene cream, a topical cream prescribed for burns, because it would be unlikely to harm Plaintiff in the event that his condition was not caused by sunburn.  *Id.* at 5.

Plaintiff was seen again on July 25, 2009 by Nurses Jana Wencl and Shannon Hartman.  *Id.* at 10-11.  They noted no open areas or blistering on Plaintiff's legs.  *Id.* Nurse Hartman indicated that Plaintiff's ankles had moderate non-pitting edema and recommended that Plaintiff elevate his legs.  *Id.* at 11.  Dr. Creany saw Plaintiff again on July 28, 2009, and noted that there was a fifty-percent reduction in the rash on his legs; he did not observe any skin necrosis.  *Id.* at 5.  Plaintiff was seen by Dr. Creany on July 31, 2009, and Dr. Creany noted that the skin condition on Plaintiff's legs had returned to its baseline with respect to the edema and hyperpigmentation.  *Id.* at 5-6.  The purpuric rash had been completely resolved, and Dr. Creany did not notice any skin sloughing or

necrosis. *Id.*

If the condition on Plaintiff's legs was a sunburn, then the impact on his overall health was minor, according to Dr. Creany. *Id.* at 6. Dr. Creany states that a sunburn would not cause Plaintiff to have long-lasting or permanent damage or weakness to the skin on his legs. *Id.* A sunburn would not cause the skin to be more likely to develop sores, ulcers, bruises, or injections, and would not cause the skin on Plaintiff's legs to become more photosensitive in the future. *Id.* If the plaintiff suffered a sunburn on July 23, 2009, Dr. Creany asserts that there would be no medical reason that Plaintiff would have long lasting effects after it was healed and no reason that it would cause him to potentially need to have his legs amputated years later. *Id.* at 7. Dr. Creany noted that Plaintiff's chronic edema problem in his legs pre-dated the sun exposure that took place on July 23, 2009, and would not be related to exposure to sunlight during the search. *Id.*

Plaintiff seeks monetary compensation from Defendants in the amount of $1,750,000. *See Compl.* [#1-1] at 10. Plaintiff also seeks reimbursement for medical costs and co-payments incurred as a result of Defendants' actions on July 23, 2009; that Health Services provide free examinations for prisoners with known health problems during security operations; and that Defendants not charge Plaintiff for any medical treatment arising from or as a result of Defendants' actions on July 23, 2009. *Id.* Finally, Plaintiff requests that Defendants develop and implement policies which mandate involvement of health services in all security operations. *Id.* Plaintiff requests summary judgment in his favor on his Eighth Amendment claim. *See Plaintiff's Motion* [#74]. Defendants likewise request summary judgment in their favor. *See Defendants' Motion* [#90]. The Court addresses both Motions below.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the case under the governing substantive law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 477 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission*

*Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).   The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

Within the context of cross-motions for summary judgment, the Court considers each motion on its own merits, as "the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).   When the movant bears the ultimate burden of persuasion at trial, the movant must show the absence of a genuine issue of material fact by demonstrating each "element of its claim or defense by sufficient, competent evidence to set forth a *prima facie* case." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).   After the movant has met his initial burden, the burden shifts to the nonmovant to either "produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial or to submit an affidavit requesting additional time for discovery." *Celotex,* 477 U.S. at 331 (Brennan, J., dissenting); *In re Ribozyme*, 209 F. Supp. 2d at 1111; Fed. R. Civ. P. 56(e)-(f).

When considering Plaintiff's filings, the Court is mindful that it must construe the filings of a *pro se* litigant liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).   However, the Court should not be a *pro se* litigant's advocate, nor should the Court "supply additional factual allegations to round out [a *pro se* litigant's] complaint or construct a legal theory on [his] behalf." *Whitney v.*

*New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110).  In

addition, Plaintiff, as a *pro se* litigant, must follow the same procedural rules that govern

other litigants.  *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

As an additional preliminary matter, the Court "must accord substantial deference

to the professional judgment of prison administrators, who bear a significant responsibility

for defining the legitimate goals of a corrections system and for determining the most

appropriate means to accomplish them."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

To this end, the Court notes the well-established law that prison management functions

should be left to the broad discretion of prison administrators to enable them to manage

prisons safely and effectively.  *See, e.g.*, *Meachum v. Fano*, 427 U.S. 215 (1976).

Accordingly, courts should interfere with the management of prisons only under exceptional

and compelling circumstances.  *Taylor v. Freeman*, 34 F.3d at 266, 268-70 (4th Cir. 1994).

Indeed, the Tenth Circuit has stated that it "abhor[s] any situation or circumstance requiring

the intervention of the federal courts in matters involving the administration, control and

maintenance by the sovereign states of their penal systems.  It is a delicate role assigned

to the federal courts to display that restraint so necessary 'in the maintenance of proper

federal-state relations.'"  *Battle v. Anderson*, 564 F.2d 388, 392 (10th Cir. 1977) (citation

omitted).  As such, "sweeping intervention in the management of state prisons is rarely

appropriate when exercising the equitable powers of the federal courts."  *Taylor*, 34 F.3d

at 269 (citations omitted).

### III.  Analysis

The Court first addresses Defendants' Motion, which seeks summary judgment on

the ground that Plaintiff has failed to put forth sufficient evidence to substantiate his Eighth Amendment claim.  *Defendants' Motion* [#90] at 1.

Defendants assert qualified immunity as to Plaintiff's claim.  Government officials are entitled to qualified immunity from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person in their position would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity also offers protection from trial and other burdens of litigation.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"[B]ecause qualified immunity is 'designed to protect public officials from spending inordinate time and money defending erroneous suits at trial," the Court reviews summary judgment motions involving a qualified immunity defense "somewhat differently" from other motions for summary judgment.  *Clark v. Edmunds*, 513 F.3d 1219, 1221 (10th Cir. 2008) (internal citations omitted).  When defendants assert a qualified immunity defense in a summary judgment motion, "[t]he threshold inquiry is whether the . . . evidenced facts . . . taken in the light most favorable to the plaintiff show a constitutional violation."  *Simkins v. Bruce*, 406 F.3d 1239, 1241 (10th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The Court must also consider whether Plaintiff has shown that "the constitutional right was clearly established at the time of the alleged unlawful activity."  *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

In order for Plaintiff's claim "to survive summary judgment, the record must contain facts that rebut the presumption of [Defendants'] immunity from suit." *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001) (discussing special nature of qualified immunity defense);

*see Rounds v. Corbin*, No. 04-cv-02532-CMA-KMT, 2009 WL 2982006, at *2-3 (D. Colo. Sept. 11, 2009) (denying summary judgment motion on qualified immunity where the plaintiff "submitted more than unsupported allegations" to support his claim); *Kelley v. City of Albuquerque*, 375 F. Supp. 2d 1183, 1203 n.7 (D.N.M. 2004) (citing *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)) (noting that to overcome the defendant's motion for summary judgment on basis of qualified immunity, the "plaintiff must do more than rest on [his] own speculation or pleadings"); *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 593 (10th Cir. 1999) (denying summary judgment on qualified immunity where the "[t]he record supports the allegation that the plaintiffs' Fourth Amendment rights were violated"); *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (noting that when "a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred").

Plaintiff bears the burden of proving that Defendants' actions violated clearly established law. *Guffey v. Wyatt*, 18 F.3d 869, 871 (10th Cir. 1994). *See Saucier*, 533 at 201 ("[W]hether the right was clearly established . . . must be undertaken in light of the specific context of the case, not as a broad general proposition.").  "[T]he right the official is alleged to have violated must have been 'clearly established' in a particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Id.* at 202 (citation omitted). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct . . . . If the

officer's mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.  After all, "qualified immunity precludes the imposition of liability for 'all but the plainly incompetent or those who knowingly violate the law.'" *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citation omitted).

It is no longer mandatory that the Court first consider whether Plaintiff has demonstrated a constitutional violation by Defendants; using its discretion, the Court may move immediately to an analysis of whether the right at issue was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 236.  In this matter, it is appropriate to first address whether Plaintiff has demonstrated that Defendants violated his constitutional rights.

The Eighth Amendment requires that "prison officials . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and [that they] 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).  The Court's analysis of Plaintiff's Eighth Amendment claim involves both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

## A.    Objective Component

As to the objective component, the Court considers whether Plaintiff was deprived of a sufficiently serious basic human need, *i.e.*, an extreme deprivation.  "Because discomfort is 'part of the penalty that criminal offenders pay for their offenses against society, . . . only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation.'"

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations omitted).

Here, the issue is allegedly delayed or inadequate medical care of Plaintiff.  "[A] medical need is considered 'sufficiently serious' if the condition 'has been diagnosed by a physician as mandating treatment . . . or is so obvious that even a lay person would easily recommend the necessity for a doctor's attention.'"  *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 2001)).

As a result of sun exposure on July 23, 2009, Plaintiff alleges that he suffered a "severe skin condition," that he is still receiving treatment for that condition, and that he may have to have his legs amputated.  *See Compl.* [#1].  Plaintiff states that he received medical treatment from January 18, 2011 through May 5, 2011 regarding his legs, chest pains, blood pressure, and heart condition.  *Decl. of Mason* [#78].  Plaintiff additionally alleges that Dr. David Oba ("Oba") said that ultra-violet rays penetrated through Plaintiff's pants and that Plaintiff may need to have his legs amputated.[7]  *Decl. of Mason* [#79]; *see also Decl. of Mason* [#80].  However, Plaintiff fails to provide any medical documentation or expert testimony to support these allegations, most notably the severity of his alleged injury.

Furthermore, "in order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*."  *Adams v. Am. Guarantee & Liability Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (emphasis in original) (citations omitted). "Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because a third party's description of a witness' supposed testimony

---

[7] The record is devoid of direct evidence from Dr. Oba or of medical records from Plaintiff's treatment by Dr. Oba.

is not suitable grist for the summary judgment mill." *Id.* (citations and internal quotations marks omitted).  Therefore, even if Plaintiff's allegations were sufficient to establish his alleged injury, his claim would not survive summary judgment because Dr. Oba's alleged statement about the possibility of amputation is hearsay.  Accordingly, Dr. Oba's alleged statement may not be used to establish that Plaintiff suffered any "sufficiently serious" injury.

Additionally, Dr. Timothy Creany treated Plaintiff during the two years prior to July 23, 2009 and treated Plaintiff immediately following the search. *See Aff. of Creany* [#90-3] at 2.  After treating Plaintiff on July 24, 2009, Dr. Creany noted that Plaintiff's medical condition following the search involved a "bruise like" appearance of his legs above his ankle, a "minimally tender" rash, and edema.  *Id.* at 4.  However, Plaintiff had previous incidents of edema and hyperpigmentation of his legs.  *Id.*  Dr. Creany noted that Plaintiff might be suffering from a sunburn, but that it was unlikely because during the search, Plaintiff's legs were covered by his pants, and Plaintiff did not have any of the same symptoms on his face, head, neck, or arms, which were directly exposed to the sun.  *Id.* at 4-5.  On July 28, 2009, Dr. Creany saw Plaintiff and noted that the rash was reduced by approximately fifty-percent.  *Id.* at 5.  On July 31, 2009, Dr. Creany noted that Plaintiff's rash had completely subsided, and his skin returned to its baseline regarding edema and hyperpigmentation.  Finally, even if Plaintiff was suffering from a sunburn, all of its effects had been resolved by July 31, 2009 and any "impact on his overall health was minor." *Id.* at 6.  Therefore, Dr. Creany states that the search did "not cause any long-lasting or permanent damage" and would not cause Plaintiff to have his legs amputated. *Id.* at 6-7.  Accordingly, Defendants have provided sufficient evidence that Plaintiff did not suffer any

"sufficiently serious" injury.

To the extent that Plaintiff also raises an issue related to delay in receiving medical treatment, the Tenth Circuit has held that "(1) a medical professional failing to treat a serious medical condition properly; and (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition" may "constitute deliberate indifference in a prison medical case." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2008)).  However, "[d]elay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."  *Sealock*, 218 F.3d at 1210 (noting that "not every twinge of pain suffered as the result of delay in medical care is actionable").  As noted above, Plaintiff has not provided admissible evidence that he suffered any substantial harm and Defendants have provided evidence that Plaintiff did not suffer substantial harm.

Plaintiff also claims that on July 23, 2009, he was taking Furosemide, Simvastitin, and Amitriptyline, which cause photosensitivity.  *Aff. of Mason* [#95] at 1-2.  Plaintiff supports his allegation that these drugs can cause photo-sensitive reactions by citing to "Davis's Drug Guide for Nurses, Ninth Edition, written by Judith H. Deglin, I.S.B.N. 0-8036-1152-8."  *Id.*  According to Plaintiff, individuals taking these drugs are advised to "use sunscreen and wear protective clothing to prevent photosensitive reactions" and to contact health care professionals if "muscle weakness, cramps, nausea[,] dizziness, numbness, or tingling of the extremities occur."  *Id.*  Plaintiff also provides definitions of "chemical photosensitivity" and "statsis dermatitis" by citing to the "Merck Manual of Medical Information, Second Home Edition, edited by Mark H. Beers, M.D., I.S.B.N. 978-0-7434-

7753-8." *Addendum to Plaintiff's Motion for Summary Judgment and Plaintiff's Declarations* [#99] at 2.  First, Plaintiff fails to provide copies of these authorities for the Court's review.  Second, the Drug Guide cited by Plaintiff appears to advise a preventative measure which Plaintiff does not dispute was taken here: he was wearing "protective clothing" over his legs, i.e., pants.  Third, Plaintiff fails to allege that he suffered any of the symptoms specified in the Drug Guide, like muscle weakness, cramps or nausea.  Fourth, aside from his statement that he was taking these medications, Plaintiff fails to offer any evidence that these drugs caused his rash.  Additionally, according to Dr. Creany, Plaintiff is not "photosensitive" and none of his medications caused him to be photosensitive or more susceptible to sunburns.  *See Aff. of Creany* [#90-3] at 3.  Regardless, even if there is a fact issue regarding whether Plaintiff is photosensitive, whether his medications made him photosensitive, or whether his alleged injuries were a result of his photosensitivity and sun exposure, the issue is irrelevant because, as stated above, Plaintiff has failed to provide admissible evidence that he suffered any "sufficiently serious" injury.

Therefore, the objective component of Plaintiff's Eighth Amendment claim is not satisfied because there is no genuine issue of material fact as to whether Plaintiff was deprived of a sufficiently serious basic human need.

**B.    Subjective Component**

Because Plaintiff has failed to satisfy the objective component of his Eighth Amendment claim, the Court need not address the subjective component .  However, the Court will do so briefly for thoroughness.  As to the subjective component, the Court considers whether Defendants intended the harm, *i.e.*, acted with deliberate indifference to the harm that could result.  Deliberate indifference can only be proved by showing that

Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The subjective component requires a showing of "obduracy and wantonness." *Whitely v. Albers*, 475 U.S. 312, 319 (1986).

This standard recognizes a balance between "the exigencies of running a prison" and the "'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Moreover, "[t]he Eighth Amendment 'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (citation omitted). Thus, while prison officials must take reasonable measures in securing a safe and humane environment for prisoners, the Court should take into account the circumstances of the challenged conduct. *Id.* at 974; *see also Hudson*, 503 U.S. at 5-6 (holding that a court should give wide-ranging deference to prison staff).

As a preliminary matter, it should be noted that an inmate's difference of opinion concerning the medical treatment that he received or did not receive does not generally support a claim for cruel and unusual punishment. *Olsen v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993). A "prisoner's right is to medical care–not to the type or scope of medical care which he personally desires." *Henderson v. Sec'y of Corr.*, 518 F.2d 694, 695 (10th Cir. 1975) (citation omitted). To the extent that Plaintiff, in his opinion, asserts that Defendants did not satisfactorily perform their duties in timely authorizing medical care, "such a difference of opinion [arguably] amounts to a medical malpractice claim . . . [which] cannot

be the basis for a federal [§ 1983] action . . . .  [A] medical malpractice claim does not become a constitutional violation simply because the plaintiff is a prisoner." *Pearson v. Simmons*, No. Civ.A. 95-3006-GTV, 1998 WL 154552, at *2 (D. Kan. Mar. 17, 1998) (citations omitted) (noting that inmate's allegation that defendants were deliberately indifferent to his medical injury based upon a disagreement about the level of care he received for that injury did not state an Eighth Amendment claim).

Furthermore, Plaintiff must provide sufficient factual allegations indicating that Defendants "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the [Defendants] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and [they drew] the inference." *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 809 (10th Cir. 1999) (internal quotation and citation omitted).  Here, Plaintiff fails to meet either requirement.  Given Defendants' lack of medical training, they cannot be held liable unless Plaintiff's statements put them on notice of an emergent medical need which they ignored.  *Ankeney v. Hartley*, No. 09-cv-02085-CMA-MJW, 2010 WL 2004777, *6 (D. Colo. Mar. 29, 2010) (citing *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920-21 (N.D. Ill. 2002) ("Because deliberate indifference requires actual knowledge of a serious risk of harm, [Plaintiff] may not sue nonmedical personnel who denied his grievances.")); *Thomas v. Ortiz*, No. 07-cv-00400-WDM-MEH, 2007 WL 3256708, at *3-4 (D. Colo. Nov. 1, 2007) (holding that prison official deriving his knowledge of Plaintiff's alleged injury from grievance process is not personally liable unless he was directly involved in the alleged unlawful treatment).  Here, Defendants' involvement, including their responsiveness, does not evidence the type of neglect necessary to hold them constitutionally liable for Plaintiff's alleged injuries.  *Kikumura v. Osagie*, 461 F.3d 1269,

1293 (10th Cir. 2006) ("it is not enough to allege that [the] prison official failed to alleviate a significant risk that [they] should have perceived but did not . . . . [Rather,] a prisoner must establish that defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.").

As Defendants do not bear the ultimate burden of persuasion at trial, Defendants need only make a prima facie showing of the absence of a genuine issue of material fact by demonstrating the lack of evidence to support an essential element of Plaintiff's claim. *Adler*, 144 F.3d at 670-71. Defendants state that on July 23, 2009, they were not aware of any of Plaintiff's medical history, preexisting conditions, or current prescriptions because inmates' medical information is "confidential and privileged." *See Aff. of Hughes* [#90-1] at 6; *see also Aff. of Francis* [#90-2] at 5. Additionally, Plaintiff did not notify Defendants that he was hypersensitive to the sun. *See Aff. of Hughes* [#90-1] at 6; *see also Aff. of Francis* [#90-2] at 6. Likewise, Plaintiff does not allege that he informed Defendants of any of his medical conditions or history. Defendant Hughes avers that he notified the inmates that if they needed any medical attention, they should notify him. *See Aff. of Hughes* [#90-1] at 2-3; s*ee also Aff. of Francis* [#90-2] at 2. Defendant Francis states that he notified inmates that if they needed any medical attention, he would escort them to medical care. *See Aff. of Francis* [#90-2] at 3-4. Neither Defendant recalls any instance of an inmate being denied medical attention. *See Aff. of Hughes* [#90-1] at 6; s*ee also Aff. of Francis* [#90-2] at 4. Therefore, there is no dispute that Defendants did not have knowledge of Plaintiffs' medical conditions, the medications he was taking, or that he might be unusually vulnerable to the sun.

The Court finds that there is a lack of evidence to support the allegation that

Defendants were deliberately indifferent to Plaintiff's medical needs.  Therefore, the burden shifts to Plaintiff to provide sufficient evidence to the contrary.  However, to overcome Defendants' affidavits, Plaintiff must point to specific evidence that Defendants knew of and disregarded an excessive risk to his health or safety.  *Farmer*, 511 U.S. at 837.  Plaintiff alleges that he informed Defendant Hughes that Plaintiff's "legs felt as if they were on fire," and informed both Defendants that he was not feeling well.  *Decl. of Mason* [#76] at 2-3.  Both Defendants responded by telling Plaintiff to inform someone if he was "going to fall out."  *Id.*  Plaintiff also alleges that he informed Defendants that he "needed to go to medical."  *Decl. of Mason* [#80] at 1.  However, Plaintiff did not tell anyone he was "going to fall out" or that he needed immediate medical attention.  As noted above, he also failed to inform Defendants of his medical conditions.  Plaintiff additionally alleges that he informed "various staff" that he was "not feeling well."  *Id.* at 3.  However,  Plaintiff fails to specifically allege that he showed Defendants his legs, spoke to them about his alleged photo-sensitivity, told them he was taking multiple medications, or indicated anything other than discomfort from being outside in the sun.  Therefore, Plaintiff fails to demonstrate that Defendants were aware of facts from which an inference of a substantial risk of serious harm existed.  Moreover, there is no evidence that Defendants actually drew such an inference.

Additionally, it is undisputed that Plaintiff received medical attention on July 24, 2009, the day after the July 23, 2009 search.  *Decl. of Mason* [#76] at 3; *Aff. of Creany* [90-3] at 3-5.  Therefore, at most, Plaintiff was denied medical attention for one day for treatment regarding a "bruise-like" appearance, a rash, and edema.  *Aff. of Creany* [90-3] at 4*; see, e.g., Inman v. Stock*, 248 F. App'x 892, 895 (10th Cir. 2007) (holding that

defendants were not deliberately indifferent when an inmate was made to wait three days before seeing a physician's assistant to request treatment for injuries suffered in a fall); *see generally Youmans v. Gagnon*, 626 F.3d 557, 564-66 (11th Cir. 2010) (collecting cases regarding delays in providing medical treatment and finding that a four-hour delay in treating cuts that ultimately did not require stitches did not amount to "deliberate indifference").

Because Plaintiff has not demonstrated that Defendants were put on notice of an immediate medical need which they ignored, he cannot establish the subjective component of his Eighth Amendment claim.

Therefore, Plaintiff has failed to meet the standards for both the objective and subjective components of his Eighth Amendment Claim, and Defendants are entitled to qualified immunity. Because Plaintiff has not provided any competent summary judgment evidence in support of his allegations, the Court finds that no reasonable jury could find in his favor. *See Anderson*, 477 U.S. at 248; *Bones*, 366 F.3d at 875 (explaining that conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence). Accordingly, the Court **recommends** that Defendants' Motion [#74] be **GRANTED** and that Plaintiff's Motion [#74] be **DENIED**.

## IV. Conclusion

IT IS RESPECTFULLY **RECOMMENDED** that Plaintiff's Motion [#74] be **DENIED**, that Defendant's Motion [#90] be **GRANTED**, and that judgment enter in favor of Defendants as to Plaintiff's single claim.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have

fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated January 22, 2013, at Denver, Colorado.

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

-23-